ANTISDEL *v.* CANFIELD.

REAL-ESTATE BROKERS—COMMISSIONS—EVIDENCE.

> Plaintiff, a real-estate broker, was given a specified time to accomplish a sale of defendant's land. A sale was not effected by plaintiff, but, after the time limited had expired, defendant named a new price, and plaintiff thereupon agreed to sell the land at once. A year later defendant closed a deal with one with whom plaintiff had carried on some negotiations, but the price realized was less than that for which plaintiff had been authorized to sell. *Held,* that plaintiff did not bring himself within the terms of the agreements, and was not entitled to commissions.

Error to Kent; Grove, J. Submitted October 5, 1898. Decided January 20, 1899.

*Assumpsit* by Arthur R. Antisdel against John Canfield for commissions on the sale of land. From a judgment for plaintiff, defendant brings error. Reversed.

*Fitz Gerald & Barry* (*Francis A. Stace* and *Benton Hanchett,* of counsel), for appellant.

*W. D. Fuller* (*Bunker & Carpenter* and *George A. Farr,* of counsel), for appellee.

MOORE, J. The plaintiff recovered a judgment against the defendant for commissions, to which he claims he was entitled upon a sale of pine land made to the Thayer Lumber Company. The defendant brought the case here by writ of error.

Some correspondence was had between the parties in relation to the sale of a large tract of land in which Mr. Canfield had an interest. It is claimed by plaintiff that in August, 1895, an arrangement was made by which the plaintiff was to have a commission of $20,000, and that the conditions had occurred which entitled him to his

commission.  Mr. Canfield denied in the most emphatic language that he had ever employed Mr. Antisdel as his agent, or had ever had any relations with him, except upon the basis that Mr. Antisdel represented a purchaser from whom he was to obtain his commission.  It is the claim of counsel for defendant that, taking the record as made by the plaintiff and his witnesses, plaintiff is not entitled to recover, for several reasons:

1.  Because he has not brought himself within the terms of the agreement which he says he had with Mr. Canfield.

2.  Because Mr. Antisdel did not keep faith with Mr. Canfield in truthfully advising him of his relations with would-be purchasers, inasmuch as an offer he claims Mr. Monroe made of $1,150,000 was reported to Mr. Canfield as an offer of $1,125,000 net.

3.  Because it appears, from testimony offered on the part of the plaintiff, he had associated with himself, to assist in the sale of the land, Mr. Brayton and Mr. Houseman, each of whom was to share equally with plaintiff in his commission from Mr. Canfield, while at the same time Mr. Houseman and Mr. Brayton had agreed with Mr. Monroe to help him buy the land, and, in case he succeeded in doing so, were to be paid by him $5,000.

It is urged that, under such circumstances, it is against public policy to allow the plaintiff to recover.  The case has been thoroughly and ably briefed.

The case as made by the plaintiff is substantially as follows:  January 14, 1895, Mr. Antisdel wrote Mr. Canfield, asking if he could be induced to sell his pine; if so, at what price; stating he would like a large tract for Muskegon.  On the following day, Mr. Canfield replied:

"It is not for sale based on present prices for lumber.  Think I offered it,    *    *    *    with a mill plant and salt block here, valued at $100,000, for $1,500,000.  Based on such valuation, I would consider an offer."

Mr. Antisdel afterwards visited Manistee, and procured plats showing the lands.  He then arranged to have Mr. Brayton assist him in handling the land.  He does not claim that, prior to August 14, 1895, he was expecting a

commission from Mr. Canfield. It is his claim that, on August 14th, he, in company with Mr. Brayton, had an interview with Mr. Canfield, at which time the price put upon the land was $1,500,000 if sold with the timber to be manufactured elsewhere than at Manistee, and $1,400,000 if sold with the timber to be manufactured at Manistee; that it was then arranged the mill and salt-block property were to be left out of the transaction, and, if Mr. Antisdel found a purchaser satisfactory to Mr. Canfield, Mr. Antisdel was to be paid a commission of $20,000, and Mr. Antisdel was allowed until January 1, 1896, to accomplish a sale. Shortly after this, Mr. Houseman was brought into the transaction to assist Mr. Antisdel and Mr. Brayton. It is plaintiff's claim that, during the year 1895, he obtained an offer from Mr. Dempsey of $1,010,000, which offer he communicated to Mr. Canfield, and the offer was declined. On November 8, 1895, Mr. Canfield wrote Mr. Antisdel:

"I decline Mr. Dempsey's offer, and, if not disposed of before the 1st of January, withdraw my offer to accept any price. Although urgently requested to name the same price to other parties, I think it a bad time to sell pine, and refrain from doing so."

It is the claim of Mr. Antisdel that on December 26, 1895, he was informed over the telephone by Mr. Houseman and Mr. Brayton that Mr. Monroe, acting for the Thayer Lumber Company, would pay $1,150,000 for the lands. The next day he wrote Mr. Canfield, "I am offered by good parties $1,125,000 net for your pine timber," etc. An examination of the record shows Mr. Monroe did not in fact make any such offer, but there was talk in which he was urged to make an offer of that amount, but declined to do so, but said if an offer was made he would soon decide whether to accept it or not. It is Mr. Antisdel's claim that on January 3d he had an interview with Mr. Canfield in the office of Mr. Antisdel, and what occurred there and subsequently is stated by Mr. Antisdel as follows:

"Mr. Canfield began to tell me about his pine. He said

he had been deceived by some one, but whom he did not say. I said, 'Mr. Canfield, you have been asking too much for your pine. Now,' I said, 'what is the least thing you will take for it?' Mr. Canfield says, 'I will take $1,200,000 net.' I said, 'Mr. Canfield, I will sell it at once.' He gave me 10 days to report what success I met with. * * *

"*Q.* What did you do then? What happened in reliance on that?

"*A.* I informed Mr. C. L. Houseman at once of the proposition that had been made.

"*Q.* What more did you do with Mr. Canfield, if anything, in regard to the matter?

"*A.* I saw Mr. Canfield on the 11th of January, at his home again, in 1896, and I told him that Mr. Monroe had accepted his proposition, had been to Boston to see his company, and it was a mere matter of time when they would buy the pine, but for the present the condition of money matters was in such condition that they thought they would have to wait a little. Mr. Canfield said that he did not know that he blamed them; he would probably do the same thing. But I said, 'Mr. Canfield, you don't need to cut your price or change it; the price has practically been accepted.'

"*Q.* What was that proposition which you say Mr. Monroe had accepted?

"*A.* Twelve hundred and twenty-five thousand dollars. Mr. Canfield asked me what the price was that I offered it for to Mr. Monroe, and I told him, and he said that was very low. He says, 'I asked him $1,350,000 for the same piece.'

"*Q.* This was after he had placed the $1,200,000 figure on it, was it not?

"*A.* Yes, sir.

"*Q.* Now, go on and state briefly what else took place in regard to this matter, down through until the final end of it,—between you and Mr. Canfield, I mean.

"*A.* I met Mr. Canfield at different times at the Morton House, and Mr. Canfield told me to keep him posted; that it was not necessary for me to come to his place or do anything without I had a definite or sure proposition to make him. During the summer, or at the commencement of the fall of 1896, I met Mr. Canfield, and I said, 'Mr. Canfield, I have not bothered you of late because matters stand about the same as they did.' I said, 'These parties

are waiting now for election.' I said, 'We probably cannot do anything until after election. If McKinley is elected, why, they feel that they would be justified in buying the pine.' I don't think I saw Mr. Canfield again until after election, but I wrote him right after election.

"*Q.* You wrote a letter after election?

"*A.* I wrote a letter after election.

"*Q.* On this subject-matter?

"*A.* On this subject-matter, which the letter will show for itself, and the answer from Mr. Canfield to it.

"*Q.* Well, what else took place?

"*A.* I think it was about the 20th of December, 1896, I saw Mr. Canfield at his home, and I told him that, from the way things looked, it looked as though he and Mr. Monroe had gotten together for the purpose of closing the deal and leaving me out. He did not tell me whether they had or had not. Then, when I started to come away he said, 'If anything new comes up, let me know.' That was about the last words he said before I left him.

"*Q.* Well, after that?

"*A.* About January, I think, the first, I heard that the deal was about being closed.

"*Q.* What deal?

"*A.* The deal to the Thayer Lumber Company.

"*Q.* Of this land?

"*A.* Yes.

"*Q.* Did you see Mr. Canfield after that?

"*A.* Yes, sir.

"*Q.* State when.

"*A.* I saw Mr. Canfield at the Morton House, and I told him, as the deal had been closed, I expected him to pay his commission; and he said that he had not been informed up to that time of the deal's being closed.

"*Q.* When was this?

"*A.* About February 20th, I think, 1897."

The statement made by Mr. Antisdel in January, 1896, to Mr. Canfield, that Mr. Monroe had accepted the offer, is not true. The record shows the following facts: The Thayer Lumber Company is a corporation, whose officers and directors reside in Massachusetts. Its manager in Michigan was Mr. Monroe. The record is undisputed that he had no authority to accept or make an offer of upwards of $1,000,000 for these lands. Mr. Antisdel did not have

the conversation with Mr. Monroe which he construes as an offer for these lands, but the conversation was between Mr. Houseman, acting for Mr. Antisdel, and Mr. Monroe, who represented the Thayer Lumber Company. Mr. Houseman's version of it is as follows:

"I told Mr. Monroe Mr. Canfield had made an offer so we could offer the timber to Mr. Monroe for $1,225,000, and which would include the $5,000 which he had previously promised to Mr. Brayton and me in case we effected a trade. * * * After a long talk over the matter, he told me he would sleep on the proposition, and decide by morning whether or not he would go to Boston to submit the offer to his principals."

Mr. Monroe went to Boston, and on his return informed Mr. Houseman he had laid the matter before his principals, and they were not inclined to enter into the deal at that time. They did not feel warranted in undertaking a deal of that magnitude until financial conditions should be greatly improved. They did not think the financial depression would be long continued, and when the times changed they would then talk of the matter, and would then purchase the timber if it was in the market. Mr. Houseman further said that in March Mr. Monroe told him he could not ask him to refrain from offering the timber to other parties, but to keep him advised; and that later Mr. Monroe told him he had received no news from his principals that they wished to take up the trade.

Mr. Monroe's version of the transaction is that Mr. Houseman informed him he had a proposition on the basis of $1,225,000 for the land, which included the commission of $5,000 which Brayton and Houseman were to receive; that he told Mr. Houseman he would think the matter over, and decide whether to go to Boston and lay the offer before his principals. He decided to do so, and did so. They declined to consider the proposition. They were the directors of the Thayer Lumber Company. They said they did not want it; they did not care to figure on it at all. They said that, "the way financial matters were,

it was out of the question. Money was tight; they did not know what would be the outcome of money matters, and they did not want to figure on a trade of such proportions." He further testified that they gave him no authority in reference to the trade, or its continuance, and there was nothing said about taking up the trade at a later date. On his return, he told Mr. Houseman the result of his mission, and later told him, if he had an opportunity to sell the land, to go ahead and do so. The directors of the Thayer Lumber Company testified they knew nothing of Mr. Antisdel, Mr. Brayton, or Mr. Houseman, but did know of the negotiations begun in December, 1895, and the 1st of January, 1896; that they discontinued them in January, 1896, for the reason that the financial situation was such they deemed it wise to do so, and dropped the matter entirely. They further testified the negotiations were not discontinued through an arrangement or agreement with Mr. Canfield, but for business reasons upon the part of the company.

Giving the most favorable construction possible to this testimony, it not only does not indicate an acceptance of the offer made by Mr. Houseman to Mr. Monroe,. but, on the contrary, indicates that the offer was declined. Mr. Canfield denies that he ever authorized this offer to be made as was claimed by Mr. Antisdel, or that Mr. Antisdel told him it had been accepted by Mr. Monroe. After January, 1896, no offer was submitted to Mr. Canfield through Mr. Antisdel, Mr. Brayton, or Mr. Houseman. In March, 1896, Mr. Antisdel wrote Mr. Canfield, asking if he would be home the coming week. A reply was sent that he would, and adding, "If it is a land matter, you had better not come unless prepared to make me a positive and definite offer." In September, Mr. Antisdel wrote, "The party from Muskegon was here only a few days ago, and says, if McKinley is elected, the deal for your pine can be made at once, and McKinley is sure to win;" to which Mr. Canfield replied, "I am too busy trying to save the few dollars I have laid up to think

of making any new deals. After November, I may or may not have something to sell." November 6th, Mr. Antisdel wrote Mr. Canfield, "McKinley is elected, and I am very thankful. Expect to hear from my parties soon. Is everything all O. K.?" To which Mr. Canfield replied the next day, "Yes, McKinley is elected. I do not know what you refer to in the balance of your letter." November 10th, Antisdel wrote Canfield a letter explaining his letter of November 6th, and on February 22d telegraphed Mr. Canfield he should hold him for his commission. This is the substance of all the testimony produced by the plaintiff.

It appears from the record that after January, 1896, no negotiations were had between any of the parties upon the basis of $1,225,000. It does, however, appear that in the latter part of December the directors of the Thayer Lumber Company directed Mr. Monroe to see Mr. Canfield, and learn if the property was still for sale, and at what price. He saw Mr. Canfield, who asked him $1,400,000 for the property. Mr. Monroe made him a conditional offer. The negotiations finally resulted in a sale of the property in February, 1897, for $1,200,000, $250,000 paid down, and the balance to be without interest for a year. This item of interest, and the taxes for a year, which Mr. Canfield had to pay after the talk between Mr. Canfield and Mr. Antisdel of January, 1896, amounted to upwards of $50,000. The testimony offered by the plaintiff shows that one of the conditions of the alleged agreement of August, 1895, by which Mr. Antisdel was to have $20,000 in commissions, was that he should furnish a customer on or before January 1, 1896. This he did not do. One of the conditions of the alleged agreement of January, 1896, was that he should make a sale which should net Mr. Canfield $1,200,000. This he did not do. In whatever phase the case is considered, it shows an entire failure on the part of Mr. Antisdel to find a purchaser within the terms of his employment. The judge should have directed a verdict in favor of the de-

fendant. *Chandler* v. *Sutton*, 5 Daly, 112; *Wylie* v. *Marine National Bank*, 61 N. Y. 415; *Sibbald* v. *Beth-lehem Iron Co.*, 83 N. Y. 378 (38 Am. Rep. 441); *Bab-cock* v. *Merritt*, 1 Colo. App. 84; *Thuner* v. *Kanter*, 102 Mich. 59; *Douville* v. *Comstock*, 110 Mich. 693.

It is not necessary to discuss the other assignments of error.

The judgment will be reversed; and as, from Mr. Antisdel's own showing, he is not entitled to recover, no new trial will be directed.

The other Justices concurred.