PRINDLE v. ALLEN.

1. BROKERS — REAL PROPERTY — VENDOR AND PURCHASER — COMMISSIONS—CONTRACT.

Evidence that defendant told plaintiff he would pay a commission of $500 if plaintiff would sell his farm, fixing the price at $16,000; that defendant offered the purchaser which plaintiff secured certain additional crops and personal property at the price named, and offered to sell the bare farm for $14,500; that he subsequently sold the premises to the same party at $15,500, warrants a finding by the jury that the contract was one of ordinary agency, and the vendor retained control of the selling price, which he modified during the negotiations until a satisfactory agreement was reached; and a verdict for the broker's commissions was justified.[1]

---

[1] As to when real estate broker has performed contract to find purchaser or effect an exchange of his principal's property, see note in 44 L. R. A. 593.

As to broker's right to commission where principal sells to broker's customer at reduced price, see note in 15 L. R. A. (N. S.) 272.

2. SAME.
    That the sale was made, at a price lower than plaintiff was
        first instructed to ask, did not defeat the broker's right to
        compensation.

Error to Van Buren; Des Voignes, J. Submitted
January 12, 1911. (Docket No. 74.) Decided February
1, 1911.

Assumpsit by Eugene F. Prindle against Eugene Allen
for broker's commissions. Judgment for plaintiff. De-
fendant brings error. Affirmed.

*Thos. J. Cavanaugh*, for appellant.

*David Anderson* and *William J. Barnard*, for ap-
pellee.

BROOKE, J. Plaintiff brought suit and recovered
against defendant a judgment for $500, that being the
amount claimed by plaintiff as a commission upon the
sale of defendant's farm to one Michael Burris. Defend-
ant has removed his case to this court for review.

The principal contention of defendant is that, under the
testimony offered by and on behalf of the plaintiff, the
defendant, at the close of plaintiff's case, was entitled to a
directed verdict in his favor, for the reason that, he claims,
the undisputed evidence shows that the contract of agency
between the parties was special in character, and was to
the effect that plaintiff should sell defendant's farm for the
sum of $16,000, in which event defendant would pay
plaintiff $500. The contract as testified to by plaintiff
was as follows:

"As to the conversation we had with reference to the
200-acre farm, after he bought that farm I saw him and
his wife at different times, and at one time when they
were together they spoke about selling the farm, and I
said, 'Mr. Allen wouldn't sell the farm,' and she said, 'I
will sell it if you bring a buyer for such a farm; you
bring them there and I will sell it.' She stated that when
they bought the farm, Mr. Allen promised that she should

have a hired girl, as there would be so much work, and that it was so hard to keep a hired girl they simply had to do the work alone, and that they would sell. After that I met Mr. Allen several times, and he told me to sell the farm and what to get for it; and he told me how much it was, described the buildings, and told me as much about the place as one naturally would, and then when I would meet him he would ask what the prospects were. I usually would meet him when he would be going to or from his Porter farm. I think the first time we talked about selling the 200-acre farm he said that he sold the old farm, and he paid the man who sold it for him $500 for making the sale, and when the price was set on the 200 acres he told me he would give the $500 commission for selling that. He told me about the house and gave me the description of the farm in detail. The price on the place was $16,000, including crops growing on the place, and he had at that time 100 acres of corn, 20 acres of potatoes, and 35 acres of wheat ground he was fitting. Of course that fore part of the season when we talked about that he didn't tell about the crops because they wasn't on the ground. He said he had paid the other agent $500 and he would give me $500, and that would leave $15,500 for himself. I know J. A. Flanigan, of Champaign, Ill. He has relatives near Lawton. I had a real estate business arrangement with him, and he and I were working together in the real estate business. I called his attention to the Allen farm, and the two Burris brothers, purporting to come from Mr. Flanigan—Michael and Sylvanus—came, but I do not remember the date, and we drove out in Porter, and I think over north of Mattawan, and saw one farm over there, and I think we drove out in Porter and saw different places, and as I remember it I showed Mr. Allen's farm in Porter at that time. They told me the kind of farm they wanted, and it took pretty near all day to tell just what they did want; that is for me to get an idea of what would suit them. I told them of Allen's Bloomingdale farm when I showed them the other and spoke of it at different times during the day, when I began to realize that there wasn't anything there that they wanted. I told them we would go out to the Allen farm the next day. They said they wanted two to four hundred acres. They did not stay over that time, as there was a train due in a few minutes, and as Michael went to see about the train the other man stayed with me

and I went and telephones Allen's house and Mrs. Allen answered the phone, but I was unable to get Mr. Allen while the Burrisses were in Lawton, but I think I did later in the evening, and told him about having them in there, and they were talking of coming over, and they decided not to come as they were dissatisfied with what they had seen. I didn't think there was in the country what they wanted, and they didn't think it would pay to stay over. I hadn't seen the place, and couldn't describe it from my personal knowledge, and they thought the best thing to do was for me to find out more particularly about the place and then write them. Allen said the place was 200 acres, and the price would be $16,000, including my commission, and when I asked him for the description of the place he said he was coming to Paw Paw in a day or two, and it would be the best plan to meet him there, and he could tell me all about it, and we left it that he would meet me here. I recall nothing further that was said over the phone. As you remind me, there was some talk about the Tedrow place. He said if they wanted more there was 200 acres in the Tedrow place across the road so they could get 400 acres if they wanted it right together, and I told him to see them, and find out what they would take, and be sure and explain that he was seeing them for me, and my commission would be 5 per cent. I met Allen at Paw Paw as appointed, and while we talked in front of the old courthouse the Bloomingdale band passed. He gave me the description of the place, told me what the house was, and the rooms, barns, outbildings, scalehouse, orchards, and other fruits on the farm, and the gravel pit, and what he was getting out of the gravel pit, and how much crops he had on the place. I cannot remember the particular items, but I wrote it down on a piece of paper that I happened to have in my pocket—the description of his place and the Tedrow place. He said he had a nice crop of corn the year before and had kept so many head of cattle there, and fed a lot of cattle, and I think he told about feeding a lot of hogs, too. He said the farm with the hundred acres of corn and potatoes and with all crops on the ground would be $16,000, and the commission out of that. He says, 'I will give you $500 commission out of that, and that will leave me $15,500.' He said, too, that the crops were worth more than he was putting them in at, because with what the place cost him, and what the crops were actually

worth on the ground, would amount to more money than
that, and it was holding out a big inducement to the peo-
ple to take it at those figures in that way.   I told him that
the commission wasn't full commission, but I thought he
was a man that could take hold and help the deal along,
and help a good deal in the deal, and it was a pretty good
sized deal, and we would let it go at $500.  He said he
would do the very best he could to carry the deal through
and he thought he could do considerable."

On cross-examination plaintiff testified:

"*Q.* When you asked him, did he tell you that the place
would have to be sold for $15,500 net to him?

"*A.* Well, I don't know as he said 'net to him.'  He
said that 'that would leave me,' he says '$15,500, and
give you a commission of $500.'

"*Q.* Did he or did he not say to you that the place
would have to net him $15,500?

"*A.* No; he didn't put it in that way.

"*Q.* Did he say anything about $15,500?

"*A.* I think he did.

"*Q.* What was talked over here on the street?

"*A.* The $15,500.

"*Q.* That he was to have net?

"*A.* Well, it would leave him $15,500.

"*Q.* In other words, you were to sell the place for $16,-
000?

"*A.* Yes.   That was the price he gave me.

"*Q.* Well, that was the price you took it upon, wasn't
it?

"*A.* Yes, that was the price that I was asking.   He
told me to ask.

"*Q.* Well, that is the price he told you to ask?

"*A.* Yes.

"*Q.* That is the price that he told you to sell it for?

"*A.* Yes.

"*Q.* And that is the price you took it to sell for?

"*A.* That is the price I offered it for.

"*Q.* And your talk and understanding with him was
that out of that $16,000 he was to have $15,500?

"*A.* That is what it would leave him.

"*Q.* In what way was it put?

"*A.* Just as I told you.   It would leave him $15,500.

"*Q.* So that there was an understanding between you

and him at that time that you were to sell his place at $16,000?

"*A.* Yes, sir; that is the price he told me to ask for it;

"*Q.* If it was sold for that you were to have $500?

"*A.* I was to have $500 for my commission. The understanding was, of course, that I was to ask $16,000.

"*Q.* And that you were to get $16,000?

"*A.* That I was to ask it. It was up to him whether he took any less or not. I couldn't offer it for any less without his authority.

"*Q.* Well, that is what you took it to do, to sell it for $16,000, didn't you?

"*A.* Yes, sir.

"*Q.* You understood that he wanted $15,500 net out of it?

"*A.* I understood if I took $500 off from the $16,000 it would leave $15,500.

"*Q.* That was talked, wasn't it?

"*A.* It was said that it would leave him that; yes.

"*Q.* And that is what he wanted, wasn't it?

"*A.* I suppose it was.

"*Q.* Didn't he say so?

"*A.* Not the way you want to put it.

"*Q.* Well, the way you want to put it, then?

"*A.* Yes, sir.

"*Q.* And you so understood it?

"*A.* Why, certainly.

"*Q.* And you knew it all the time?

"*A.* Yes. This talk was not over the phone. It was out here on the street.

"*Q.* Now, we will go back and see if you can remember the talk that you had over the phone?

"*A.* The commission was stated over the phone.

"*Q.* At what?

"*A.* Five hundred dollars.

"*Q.* In what event?

"*A.* Why, selling the place.

"*Q.* At what?

"*A.* $16,000, the price he gave me. Nothing said about any other price or any other commission, except that Allen offered the place at $14,500 without the crops or personal property. I saw Allen within a day or two after that, and then wrote Exhibit I on August 20th and Flanigan came in two or three weeks to his relatives and stayed throughout the grape season. We then went, within a

few days, over and looked at the land. We stayed at Allen's all night. We looked at the Tedrow place. I don't know as there was anything said about the price of the Allen farm. Mr. Allen didn't say he would have to have $15,500 for it, and I didn't tell him, 'Then you ask $16,000 for it, and that will leave $500 if we sell it for that.' I swear that is not true. The same talk did not occur over the phone. $16,000 was the price he always put on the place. I didn't tell him my commission would be $500. He offered the commission as $500, and I told him that was not the regular commission but we would accept that on a large deal. That talk was on Main street in Paw Paw. No one was present at the time. He had a son there part of the time. George, the one that was in the army, came up a minute and talked and went away. Allen put in some such words as 'he would give me $500 and that would leave him $15,500.' I believe that is what I swore to this morning. In the presence of Flanigan, Allen talked generally about the farm, but said nothing about the price. Mr. Allen did not then say that he had to have $15,500. He never said so. He told me that he would give me $500 commission and I took it upon that theory."

It appears that after the conversation at Paw Paw, and about the middle of August, plaintiff and Flanigan went out to defendant's farm and examined it. Upon that occasion defendant offered, as a further inducement to effect a sale, to include, with the real estate and crops, some personal property. He likewise offered to sell the bare farm for $14,500. Shortly after this examination, and in the early part of September, Flanigan took the Burris brothers to the farm, who went over it, and negotiated for it with defendant, but failed to reach an agreement. Prior to this visit, and on September 2d, plaintiff had written a letter to one of the Burris brothers, offering the farm and fully describing it. Plaintiff testified that, after the first visit of the Burris brothers to the place, defendant authorized him to offer to them, as an additional inducement to purchase, defendant's new farming tools at half price. On September 24th plaintiff again wrote to the Burris brothers, urging them to close the deal. On Oc-

tober 15th, the Burris brothers, apparently in response to a letter written by defendant's wife, returned to defendant's farm, and after defendant had agreed to include in the deal some further personal property, Burris drew up a memorandum of the terms of an agreement to be thereafter entered into between Michael Burris and defendant, if he, Burris, concluded within 10 days to buy. The price named in this memorandum was $15,500. On November 2d Michael Burris closed the deal at this figure. About October 1st, a conversation occurred between plaintiff and defendant, at which time defendant paid to plaintiff $4.50, being the livery hire expended by plaintiff upon the occasion of the first visit of the Burris brothers to the farm. The details of this conversation are in sharp conflict. Defendant's claim is that upon that occasion plaintiff accepted the $4.50 in settlement, and told him to go on with Michael Burris and "help yourself if you can." This is denied by plaintiff.

Is the contention of the defendant, that plaintiff's version of the contract clearly shows that plaintiff was to secure a purchaser for the farm for $15,500 net to defendant, tenable? We think not. The contract as testified to by plaintiff was one of ordinary agency, wherein the vendor retains the right to control the selling price. That price was controlled by defendant, and modified from time to time during the brief negotiations, until an agreement was reached satisfactory to the vendor. The defendant's theory of the case was submitted to the jury under instructions which, to say the least, were quite as favorable to defendant as he was entitled to demand.

Under the facts disclosed by the record, it is beyond dispute that plaintiff and Flanigan, his associate, brought Burris and defendant together; that this was done at the instance of defendant, and that the negotiations, after the introduction, continued until they ripened into a sale. That the sale was made at a price lower than defendant was first instructed to ask, is a matter of no moment, if plaintiff's version of the contract was correct. *Heaton* v.

*Edwards,* 90 Mich. 500 (51 N. W. 544); *Ranson* v. *Weston,* 110 Mich. 240 (68 N. W. 152); *Martin* v. *Silliman,* 53 N. Y. 615; *French* v. *McKay,* 181 Mass. 485 (63 N. E. 1068); *Henry* v. *Stewart,* 185 Ill. 448 (57 N. E. 190).

The jury by their verdict determined this issue in plaintiff's favor. The cases of *Williams* v. *McGraw,* 52 Mich. 480 (18 N. W. 227), and *Antisdel* v. *Canfield,* 119 Mich. 229 (77 N. W. 944), relied upon by defendant, have been examined, but in our opinion they do not support his contention.

Other errors assigned have received consideration, but require no discussion.

The judgment is affirmed.

MOORE, MCALVAY, BLAIR, and STONE, JJ., concurred.