ELIZABETH H. EBLING ET AL. *v.* J. CLAYTON BREWER.

[No. 73, October Term, 1927.]

*Decided January 18th, 1928.*

The cause was argued before Bond, C. J., Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*Daniel R. Randall* and *Eugene P. Childs,* for the appellants.

*Ridgely P. Melvin,* for the appellee.

Sloan, J., delivered the opinion of the Court.

In this appeal there is one bill of exceptions, and that is to the refusal of the defendants' (appellants') first, fourth, and fifth prayers, to the sustaining of the plaintiff's (appellee's) special exceptions to the defendants' fourth, and fifth prayers, to the granting of the plaintiff's second, third, fourth, and fifth prayers, and to the overruling of the defendants' special exceptions to all of the plaintiff's granted prayers. The appellants' first prayer is a demurrer to the evidence, and it is necessary, therefore, for us to consider all the evidence in order to pass upon its legal sufficiency to support a verdict for the plaintiff.

The appellants were the owners of two adjoining tracts of land on the Severn River, containing respectively seventy-nine and one hundred acres. In the seventy-nine acre tract, which bordered on the river, Henry Ebling had a life estate, with remainder to his children. The one hundred acre tract was owned by the children, who had bought it at the fore-closure of a mortgage made by their father, Henry Ebling.

About January 1st, 1925, Henry Ebling listed the whole property with the appellee, who was engaged in the real estate business at Annapolis, and agreed with him that, if the appellee secured a purchaser at $75,000, he would pay him a commission of five per cent. About this time the appellee had an inquiry from Edward S. Hine of Washington for water front property in Anne Arundel County, and on January 30th he wrote Hine that he had such a property. On February 10th Hine wrote the appellee that the day following he and a Mr. Patterson would go to Annapolis to investigate the tract, and the next day they visited the Ebling property. Following this, for about two months, there were several visits and conferences between Hine, and Henry Ebling, and the appellee, sometimes with all present, at other times between Hine and Ebling, and still others between Ebling and the appellee. On March 8th a conference was held in Annapolis at the home of Mrs. Mace, a daughter of Henry Ebling, at which there were present Henry Ebling, his sons, daughters, and sons-in-law. This was the first and only meeting of the appellee with any of the owners except Henry Ebling, and whatever confirmation of Henry Ebling's authority to represent his children there is arose out of this meeting. Messrs. Hine and Patterson were present, and the appellee says he introduced them to the children of Henry Ebling. The appellee also testified that "they afterwards explained to me" Mr. Bean was present, though he did not see him, and Bean testified that he was in Annapolis once, in April, 1925, and met the appellee in the latter's office. The appellee says, however, that he never did meet Bean until at the trial.

At the conference with the Eblings the appellee testified that "they (the Eblings) of course knew why we were there, and we immediately began to discuss the terms of sale; the price had been practically agreed upon, $75,000, and there were propositions and counter-propositions made, and we were not getting very far with them." Mr. Hine then retired, "as he thought I could make better progress if he was

not present." "Mr. Hine had put up a proposition which was not entirely agreeable to the heirs, so we talked it over and made a counter-proposition, the heirs, the defendants in this case, and myself." The appellee said his commission was "agreed upon, five per cent. of the selling price," and said that the purchase price, $75,000, had been accepted by the purchasers. "Either the next day or the day after, Mr. Ebling came into my office and I gave him an outline of the terms, which Mr. Ebling already knew, and Mr. Ebling informed me he wanted to see Mr. Randall about drawing the contract." "It was up to the point where negotiations were closed and I offered to draw the form of contract. Mr. Ebling said he would not sign a contract unless he consulted with Mr. Randall about it." The terms, as outlined in a memorandum filed by the appellee with his testimony, showed a cash payment of $500 to be made on the signing of the contract, $9,500 to be paid May 1st, 1925, two payments of $5,000 each on June 1st and July 1st, 1925, three payments of $10,000 each on September 1st, 1925, January 1st, 1926, and April 1st, 1926, and $25,000 on June 1st, 1926.

On March 9th, the day following the family gathering, Hine wrote the appellee:

"We have carefully considered the details of the proposition on the Ebling property and are prepared to make a counter proposition which follows very nearly the offer of terms made us yesterday."

He then outlined his terms, and said:

"You will notice this offer is substantially the same as the proposition they submitted to me yesterday, except that I have eliminated the payment that they asked on May 1st of $9,500. This is my final offer, Mr. Brewer, and if they will not accept it, I shall have to close up on this other property."

On March 17th, Hine again wrote the appellee, regarding a defect in the title to the seventy-nine acre parcel, which

to him seemed no obstacle, and, suggesting a meeting of the Eblings, said:

> "If you get them together, try and get them signed up on something. Make the payment $9,500 on June 1st."

On March 18th the appellee wrote Hine:

> "There are so many contingencies that might arise that I personally feel that although Mr. Randall has informed Ebling that a title can be given, that unless you have some other assurance I would not advise the purchase of the property."

On March 19th, Hine again wrote the appellee:

> "The objections to the title, while they might prove very serious to the average developer, is in my opinion not an insurmountable one."

Then, after saying he thought he could get his New York people to go through with it, and outlining his proposed plan of payments, he said:

> "I think you should get the family together and present the facts to them to sign a preliminary agreement along these lines."

On March 22nd, Mrs. Henry Ebling died, and on March 24th the appellee wrote Hine that he

> "hesitated to interview Mr. Ebling further in regard to the property."

The next day Hine write the appellee that:

> "It should be the psychological moment to reach a satisfactory deal. I am leaving the entire matter in your hands, however, as I know you are as anxious as we are to consummate a deal."

The next day, March 26th, the appellee wrote Hine:

> "I had a talk with. Ebling this afternoon and from what he tells me I think the children are in a more receptive mood. So in this connection it would

be well for you to see Ebling at an early date and arrange with him for a time when he and the children, together with Mr. Randall, can meet and have the terms of sale, as well as the distribution of the proceeds in the event of a sale, stated, which will be satisfactory to Ebling and the children."

On April 1st Hine wrote the appellee:

"I saw Mr. Ebling yesterday. * * * I was very much in hopes of getting things in shape today, but I cannot see that I am gaining anything. * * * I have acceded to practically every request they have made and I have about reached the limit. Frankly, Mr. Brewer, I would not have gone as far as I have had the property been less suitable to our purposes. * * * The thing for you to do, it would seem to me, is to arrange a final conference between Ebling, Randall, and Green and ourselves, in the immediate future, and try to get something concrete that the Eblings will stick to."

On April 3rd, Hine again wrote the appellee as follows:

"My dear Mr. Brewer: Received your letter this morning. It would seem to us that your plan is the best one, but that it would be the best course for you to get Ebling and Randall lined up for an appointment with Green. I doubt if the old man would take the initiative in the matter. Any step we may take in this direction at the present time would only give the impression that we were very anxious for the property. This may to a certain extent be true, but I have about reached the point that I have gone as far as I can go and a little farther.

"It is impossible for Mr. Rommel and myself to disclose the real people back of us, but you can assure Mr. Ebling if you wish that they are eminently responsible and he will recognize them when he learns who they are. But I certainly am not going to them every week with a different proposition. This for your cue to Ebling. If you can arrange a meeting

with Randall and Ebling and Green yourself I think you will get somewhere. Of course, I recognize how Ebling looks at it in reference to the title, but I am very sure that should he secure another buyer he would be estopped by this situation and afterward I would not dare take hold of the matter, for once the title is questioned by some one else and turned down I could not afford to take up with something which was generally known to be faulty, for this situation would be enlarged and become generally known and that would stop my sales.

"We are leaving the entire matter in your hands, Mr. Brewer, to adjust and bring to a focus.

"Sincerely yours,

"E. S. Hine."

A few days later the appellee called on Ebling who, he said, "did not seem very communicative, said he was not feeling well." "He told me he was coming to town Wednesday and would see Mr. Randall." This was the last time the appellee saw any one or did anything with the Ebling property; from that time on he was "awaiting developments," "and the preparation of the contract was left up to Mr. Ebling." In answer to the question, "Did he ever produce a contract himself?" he said, "He did not, not to me." Asked, "Was there ever any revocation of your agency at any time?" he said, "There was not." For a year or more the appellee was silent as to the whole proposition and showed no further interest or activity until he heard the property had been sold to Severn Shores, Inc., for $88,000. The evidence is that during the month of April, 1925, Hine abandoned the negotiations for the Ebling tract, and he and Bean bought a tract on the Patuxent River, and developed that during the summer of 1925.

Henry Ebling testified that after his wife's death Mr. Brewer saw him on the property, which was the second time he was ever on it, and he then told him that owing to his wife's death all negotiations were off, and that he never called on Mr. Brewer again regarding it, nor had Mr. Hine ever

seen him (Ebling) about it afterwards. Mrs. Mace and
Henry Ebling subsequently had business with Mr. Brewer in
the purchase of another property near Annapolis, but there is
no evidence that either the Eblings or Brewer again men-
tioned the sale of the Ebling tract; in fact, the evidence is
that they did not. There is no evidence that Hine ever took
up the matter again with the Eblings or Brewer, Hine not
even coming in contact with Ebling in the sale to Severn
Shores, Inc. Henry Ebling further testified that the appellee
had never submitted a contract to him or his children. An-
swering the question, "Had he ever offered to do so?" he said,
"No, I did not give him time to do that much." To the
question, "Did Mr. Brewer ever make a proposition agreeable
to yourself and the purchaser?" he answered, "No, he had no
time, no more. I did not give him no chance no more."

After October 1st, 1925, Kenneth McRae, who had been
up to that time secretary of the Southern Maryland Emigra-
tion Commission, was authorized by Henry Ebling to list the
property at $90,000, with a commission at five per cent., but
was told by Mr. Ebling that he should take up the matter of
a contract with the children. About January 1st, 1926, he
interested as prospective purchasers Elliott H. Thomson and
George B. Smythe of Washington, with whom, on March
24th, 1926, the Eblings entered into a contract of sale at
$88,000, the contract providing for brokerage to K. A.
McRae of five per cent. to be paid out of the first $25,000 of
cash. By deed dated March 29th, 1926, the property was
conveyed to Severn Shores, Inc., a Maryland corporation.
The incorporators and directors of the grantee were Elliott
H. Thomson, Robert B. Smythe, Walter L. Bean, and Ed-
ward S. Hine. Kenneth A. McRae was named in the certifi-
cate as resident agent. The stockholders at the time of the
trial were Walter L. Bean and Edward S. Hine, each with
one hundred and twenty-five shares, and Allen McCullen had
twenty-five shares. Henry Ebling, the only one of his family
to testify, said he did not know or see Hine in the second
transaction at all. McRae was the only broker and Smythe
and Thomson the only purchasers with whom he came in

contact. The record fails to disclose any connection between McRae and the original negotiations, nor is there anything in the record to show that he knew anything about Brewer's efforts to sell or Hine's to buy in 1925.

Where no time is fixed for the continuance of a contract, either party is at liberty to terminate it at will, subject only to the ordinary requirements of good faith, and if the principal seeks other assistance by means of which a sale is effected, the fact that the purchaser is one introduced originally by the first broker does not entitle the latter to commissions. *Livezy v. Miller,* 61 Md. 336; *Hollyday v. Southern Agency,* 100 Md. 298; *Howard v. Street,* 125 Md. 289; *Hill v. Iglehart,* 145 Md. 537; *Loxley v. Studebaker,* 75 N. J. L. 599; *Antisdel v. Canfield,* 119 Mich. 229; *Sibbald v. Bethlehem Iron Co.,* 83 N. Y. 378, 384; *Stedman v. Richardson,* 100 Ky. 79; *Chaffee v. Widman,* 48 Cal. 34; *Mechem on Agency,* sections 965, 968. "It is well settled that where negotiations for a sale through a broker are bona fide broken off and abandoned, and a sale finally effected through the influence of another, the first broker is not entitled to his commissions." *Walker v. Baldwin,* 106 Md. 619, 632. And this expresses the appellants' contentions in the instant case. On the other hand, the appellee asserts it to be "the established law that, after negotiations begun through a broker's intervention have virtually culminated in a sale, the agent can not be discharged so as to deprive him of his commissions." *Livezy v. Miller,* 61 Md. 336, 343; *Hollyday v. Southern Agency,* 100 Md. 296.

The evidence is that Hine was the only purchaser introduced to the appellants by the appellee, and if he is not to be treated as the purchaser, then there was no purchaser introduced by the appellee. The meeting of the Eblings at Annapolis on March 8th, 1925, considered only the proposal of the appellants to sell to Hine. No inference can be drawn from the fact that William L. Bean was in Annapolis once during the 1925 negotiations and appears as one of the stockholders of the ultimate purchaser. There is no evidence that Bean was considered by the appellee as a purchaser. Where

the ostensible purchaser is unable to pay the price or comply with the terms of sale, it is no answer that his associates or those whom he expected to interest are financially responsible and able to carry on the transaction. *McGavock v. Woodlief,* 20 How. (U. S.) 221. See notes to 1 *A. L. R.* 528. The appellee's claim is that Hine and Hinc alone was the purchaser produced by him, there being no evidence that any other person was, or could be, expected to sign a contract with the Eblings.

There is no evidence as to anything being mentioned, at the first meeting of Henry Ebling and the appellee, except the price, and if a cash customer had been produced this case would not have been complicated by the negotiations for terms. The only inference to be drawn from the evidence is that the appellee produced a customer who was a promoter, and the only reason he can be considered as a purchaser is that the Eblings and the appellee so considered him and negotiated with him. The terms for a deferred payment contract were made up by the appellee and the Eblings at the meeting of March 8th, and the terms of sale were then submitted by the appellee to Hine. Hine the next day wrote the appellee for a modification of the terms, and it was not until he wrote to the appellee on March 17th, "If you get them together try and get them all signed up on something," that he indicated anything like a willingness to accept anything offered in the way of a contract, though in that letter he still asked for more liberal terms than had been proposed, as to the deferred payments. The appellee testified that the parties had agreed on terms, but this statement is contradicted by the letters of Hine offered by the appellee in support of his contention.

"In the common case of a real estate agent or broker, the ordinary business understanding, and therefore the ordinary rule of law, is that the agent becomes entitled to his commission when he has procured for a client one who is able and ready and willing to contract with the client on the terms which the latter has stated to his agent." *Williston on Contracts,* sec. 1030. In *Coppage v. Howard,* 127 Md.

512, 522, this court quoted with approval from 19 *Cyc.* 246: "A broker employed to find a purchaser is not entitled to a commission where no sale is made, unless the purchaser is able, ready and willing to take the property upon the terms specified by the principal." See *Stokes v. Wolf,* 137 Md. 393, 410; *Singer Co. v. Goldsborough,* 147 Md. 628, 637, the prayer in the latter case holding the broker entitled to recover when he produced a ready and willing purchaser, able to buy on "terms authorized by the defendant."

There seems to be no disagreement amongst the authorities that it is the duty of the broker, if payments are to be deferred, to produce a purchaser ready and willing to take the property at the price and on the terms authorized by and satisfactory to the vendors. If the appellee had produced such a customer on such terms and not "terms to be agreed upon," he would have done his duty under his employment.

In this case it appears that Henry Ebling placed the property with the broker, the appellee, to sell at $75,000. By this he, in effect, represented to the broker that if the latter found a cash customer at that price a deed would be made by the owners to the purchaser. Instead of a cash customer, the broker produces one who is either unable or unwilling to make a substantial cash payment, and who asks for liberal terms for deferred payments. He discloses in his letter to the broker that he expects to interest other persons of means, but there is no evidence that any one except Hine was proposed as the buyer. The children, who own all the one hundred acre tract, and who are the remaindermen in the other tract, held a meeting, and they submitted a proposal which, down to the time negotiations fell through, Hine did not accept. Every letter he wrote the appellee after March 8th suggests a modification of the terms. Even the letter of March 18th, in which he says, "If you get them together try and get them all signed up on something," adds, "Make the payments $9,500 on June 1st, $10,000 on October 1st and $10,000 or $15,000 on January 1st, as I previously wrote you." In the conferences with Henry Ebling there is no evidence that he agreed to any other terms than those of the

meeting of March 8th, nor is there any evidence that any of the children, who do not seem to have delegated any authority as to terms to their father, were seen or communicated with by either Hine or the appellee. If the terms originally proposed, which the owners appear never to have varied, were acceptable, what necessity was there for Hine to urge further conferences with the family? The testimony leads us to no other conclusion than that the appellants and the purchaser Hine had never been in accord on the terms of sale, when Hine walked out of the transaction and the appellee discontinued his efforts to sell Hine, and thereafter made no effort to sell the property at all.

The declaration was predicated on a sale to Hine in March, 1925, and the appellee in his special exception to the defendant's fifth prayer says, "The undisputed evidence shows that the plaintiff did identify the person from whom the offer came through the plaintiff," and is further predicated on the unwarranted refusal of the appellants to consummate it by a contract with the purchaser, Hine, whom he had produced. There is no legally sufficient evidence that he was the procuring cause of the sale to Severn Shores, Inc., and the only circumstance that gives color to such a claim is that Hine was one of the two principal stockholders, and Hine testified, without contradiction, that he represented other parties and that he had no money in the proposition. There is no evidence to connect McRae with Hine prior to the conveyance of 1926. The other major stockholder, Bean, never was proposed to the Eblings by the appellee, and nothing can be inferred from his connection with the ultimate sale either as purchaser or stockholder.

From what we have said, it will appear that the appellants' first prayer should have been granted, and, as this disposes of the whole case, the rulings on the other prayers do not require consideration.

*Judgment reversed without a new trial, with costs to the appellants.*