# NILY REALTY, INC. *v.* WOOD ET UX.

[No. 229, September Term, 1973.]

*Decided October 9, 1974.*

The cause was argued on March 4, 1974, before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ., and reargued on September 13, 1974, before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*George J. Goldsborough, Jr.*, with whom was *Roy B. Cowdrey, Jr.*, on the brief, for appellant.

*William S. Horne*, with whom was *Charles E. Wheeler* on the brief, for appellees.

ELDRIDGE, J., delivered the opinion of the Court.

This is another case where a real estate broker, employed to sell a parcel of real estate for a commission, claims entitlement to that commission even though the property was not in fact sold.

Robert L. Wood and his wife Sally A. Wood, the defendants-appellees, owned a farm in Talbot County, Maryland. The farm was subject to a purchase money mortgage in the amount of $117,150.00, repayable in five equal annual installments of $23,430.00, plus interest on the unpaid balance. In the fall of 1972 the Woods did not believe that they would be able to make the next annual payment which was due on May 3, 1973, and they decided that they had to sell the farm.

On December 6, 1972, the Woods signed what was called a

"General Listing Agreement" with the plaintiff-appellant Nily Realty, Inc. The agreement "authorized" Nily Realty to offer the farm for sale at a price of $215,000.00. The document went on to provide:

> "This agreement shall continue for 12 months from date hereof. In the event NILY REALTY, INC. sells said property, I hereby agree to pay said Realtor a commission of 6%.

> "The commission is due and payable upon the signing of the Contract of Sale, but payment may be delayed until completion of contract by transfer of deed."

The "agreement" did not require Nily Realty, Inc. to do anything. The broker did not promise to advertise the property at its expense or to perform any other service toward selling the property. Moreover, there was nothing in the written document or in conversations between the Woods and personnel of Nily Realty concerning the terms of the sale, whether the $215,000.00 was to be paid in cash, whether there was to be financing, how long a buyer might have to pay the purchase price, etc. In addition, the "agreement" did not give Nily Realty an exclusive authorization to sell the property, and the Woods at about the same time entered into similar "General Listing Agreements" with eight other realtors.

On April 5, 1973, Mrs. Alice B. Nily, the principal officer of Nily Realty, Inc., telephoned Mrs. Wood and informed her that on the next day she was going to show the farm to a prospective buyer. Mrs. Nily on April 6, and again on April 8, showed the farm to a Mr. Norman G. Fischer. The testimony at the trial was somewhat in dispute as to what happened over the next several days.

According to the testimony of Mr. and Mrs. Wood, the following occurred. During the weekend of April 7-8, the Woods arranged to obtain money from Mrs. Wood's mother in order to make the annual mortgage payment due on May 3, and, therefore, they decided not to sell the farm. According to the testimony of both of them, Mr. Wood

telephoned Mrs. Nily on the morning of April 9, 1973, told her that they had decided not to sell the farm, and instructed her to "take it off the market." The next day, April 10, Mrs. Wood telephoned the other eight realtors and cancelled the listings with them. The Woods testified that they next heard from Mrs. Nily on the evening of April 13, 1973, when she telephoned them, informed them that Mr. Fischer had signed a contract to buy the farm for $215,000.00, and asked if she could come to their home that evening. Mr. Wood told her again that the farm was not for sale. Mrs. Nily replied, "I am sure you will change your mind." Mrs. Nily further told him: "I can't force you to sell the property. I can force you to pay my commission."

Mrs. Wood testified that the next morning, April 14, 1973, she telephoned Mrs. Nily because she "didn't realize that you could be forced to pay a commission . . . and I just wanted to know if she was trying to scare us or if she really could do it." Mrs. Nily replied: "Please let me show you the contract. I know you will accept it." Mrs. Nily then came to the Woods' home on the morning of April 14, 1973. Mrs. Wood testified that at that time she suggested to Mrs. Nily that if Mr. Fischer, instead of paying the full purchase price in cash, would pay twenty percent of the $215,000.00, and execute a mortgage for the balance, payable in ten annual payments at an interest rate of 8 percent, she and Mr. Wood would sign the contract. The Woods wanted to take back a mortgage instead of receiving the full price because they believed that this arrangement would result in tax savings. Mrs. Wood further testified that Mrs. Nily said that "she would offer it to Mr. Fischer and she was sure there would be no problem." In the afternoon of April 14, Mrs. Nily telephoned Mrs. Wood, said that she had spoken to Mr. Fischer, and informed Mrs. Wood that the proposed financing terms "didn't suit" Mr. Fischer. Mrs. Wood went on to testify that on the afternoon of April 14, Mrs. Nily "said she was sure we could work something out, and I never heard from her any more."

Mrs. Nily's testimony differed from that of the Woods chiefly with respect to the matter of rescinding Nily Realty's authority to sell the property. Mrs. Nily acknowledged that

Mr. Wood telephoned her on April 9, 1973, but she denied that he said anything about not wanting to sell or about taking the property off the market. According to Mrs. Nily, Mr. Wood merely wanted to know whether the prospective buyer had walked around the farm the day before. Mrs. Nily testified that she met with Mr. Fischer, the prospective buyer, early in the evening of April 13, 1973, that Mr. Fischer then was "considering making an offer of $190,000.00 for this farm," that she told Mr. Fischer that if he really wanted the farm he should offer the full listing price of $215,000.00, and that, after "three hours in negotiating," Mr. Fischer signed a proposed contract to buy the farm for $215,000.00. The proposed contract provided for $21,500.00 to be paid at the time of signing and the balance of $193,500.00 to be paid on January 2, 1974. This provision was at Mr. Fischer's insistence because he "had no use for the farm until the year 1974."

Mrs. Nily further testified that, after Mr. Fischer signed the proposed contract on the evening of April 13, she telephoned Mr. Wood and told him that she would bring the contract to him. It was at this time, according to Mrs. Nily, that Mr. Wood first told her that the farm was not for sale. As to the meeting with the Woods on April 14, and the Woods' proposal that they would change their minds and sell the farm if they could hold a mortgage for 80 percent of the purchase price, Mrs. Nily's testimony was in accord with that of the Woods.

Shortly thereafter, Nily Realty brought this action against the Woods in the Circuit Court for Talbot County, seeking a full commission of $12,900.00, based upon six percent of the $215,000.00 listed purchase price. Following the trial, the court (Clark, J.) rendered judgment in favor of the Woods. The trial judge found as a fact that on April 9, 1973, the Woods cancelled the "General Listing Agreement" and revoked Nily Realty's authority to find a purchaser for the property. It was further found that at the time of the cancellation on April 9, Nily Realty had not procured a purchaser ready and willing to buy the property on the terms listed. Finally, the trial judge found that since the

"General Listing Agreement" here involved did not require the broker to do anything, it was therefore not a bilateral contract, but was a unilateral agreement which would only become binding upon performance by the broker. The trial judge held that under Maryland law a principal may, without incurring liability, revoke a broker's authority to sell property, under an agreement like this, at any time before the broker produces a purchaser ready, willing and able to buy the property upon terms satisfactory to the principal.

On this appeal, Nily Realty argues that the cancellation of the "General Listing Agreement" was wrongful, that Nily had fully performed its part of the agreement, and that it is entitled to a commission.

(a)

Before dealing with Nily Realty's arguments as to why the cancellation of the "General Listing Agreement" was wrongful, one preliminary matter warrants discussion. Throughout these proceedings, the appellant Nily Realty's theory has been that, under the terms of the "General Listing Agreement," it earned and is entitled to a commission based upon six percent of the listing price of $215,000.00. At no time has Nily Realty sought, or offered evidence to prove, damages resulting from an alleged wrongful cancellation of the "General Listing Agreement." However, a real estate broker's recoverable damages for a wrongful revocation of the brokerage agreement may be different from his earned commissions under the terms of the agreement. *Piper v. Wells*, 175 Md. 326, 332-333, 2 A. 2d 28 (1938); Restatement (Second) of Agency §§ 445, 455; 1 Corbin, *Contracts* § 50 at 209 (1963). In this case, it is clear that Nily Realty was not entitled to its commission under the "General Listing Agreement."

A real estate broker, employed by a landowner to sell property, is not ordinarily entitled to his commission, absent a special agreement to the contrary, until the broker procures a purchaser ready, willing and able to buy upon the owner's terms, with the arrangement culminating in the

purchaser and owner entering into a valid, binding and enforceable contract for the sale of the property. The contract of sale must be signed by the broker's employer. Maryland Code (1973 Repl. Vol.), Art. 21, § 14-105.[1] And, with respect to transactions occurring prior to that statute or otherwise not covered by the statute, the cases have held that the broker must have procured one who "ultimately becomes the purchaser," with "the contract [being carried] into execution." *Wyand v. Patterson Agency,* 271 Md. 617, 621-624, 319 A. 2d 308 (1974); *Carrington v. Graves,* 121 Md. 567, 572-573, 89 A. 237 (1913); *Riggs v. Turnbull,* 105 Md. 135, 66 A. 13 (1907); *Richards v. Jackson,* 31 Md. 250, 253 (1869); *Kimberly v. Henderson and Lupton,* 29 Md. 512, 515 (1868).

In this case, there was no "special agreement to the contrary" within the meaning of Art. 21, § 14-105. Instead, the terms of the "General Listing Agreement" confirmed that the broker's right to a commission would not accrue until a valid and binding contract of sale was signed, as the agreement provided: "The commission is due and payable upon the signing of the Contract of Sale, but payment may be delayed until completion of contract by transfer of deed." The Woods did not sign a valid and binding contract of sale, and the property was never sold. As far as the record in this case shows, the Woods still own the farm. The Woods' refusal to sign the contract of sale was not a bad faith effort to deprive Nily Realty of its commission; instead, the Woods changed their minds about selling the farm. Moreover,

---

1. That statute provides (emphasis added):

   "Whenever, in the absence of special agreement to the contrary, a real estate broker employed to sell, buy, lease or otherwise negotiate real or leasehold estates or mortgages, or loans thereon, procures in good faith a purchaser, seller, lessor or lessee, mortgagor or mortgagee, borrower or lender, as the case may be, and the person so procured is accepted as such by the employer, and enters into *a valid, binding and enforceable written contract of sale,* purchase, lease, mortgage, loan or other contract, as the case may be, *in terms acceptable to the employer, and such contract is accepted by the employer and signed by him,* the broker shall be deemed to have earned the customary or agreed commission, as the case may be, whether or not the contract entered into be actually performed, unless the performance of such contract be prevented, hindered or delayed by any act of the broker."

despite their change of mind, they would have sold the farm anyway if the prospective buyer had agreed to the financing terms desired by the Woods. However, the prospective buyer was not agreeable to the owners' terms. Instead, the buyer desired terms whereby most of the purchase price would not be paid until the following year. In light of these circumstances, it is clear that at no time did the broker produce a purchaser ready, willing and able to buy upon the owners' terms, with the arrangement culminating in an executed contract of sale. Thus, Nily Realty did not at any time become entitled to a commission under the terms of the listing agreement.

In *Piper v. Wells, supra,* this Court held that the real estate broker, employed by a property owner, was not entitled to his commission under the facts of that case, but that the broker was entitled to damages because the property owner's revocation of the broker's authority was improper and constituted a breach of the listing agreement between the two. However, since the real estate broker in *Piper* had sought only the specified commission, and had not asked for damages for revocation of the employment contract, our predecessors affirmed a judgment in favor of the property owner.

In oral argument before us, Nily Realty urges that *Piper v. Wells* was based upon pleading principles of a "different time" and that if we were to conclude, as we do, that Nily had not earned its commission, we should remand the case in order for Nily to establish its damages based upon a wrongful revocation of the listing agreement. However, because we are of the view that the revocation of the "General Listing Agreement" was not legally improper, we need not, and do not, reach this question.

(b)

As previously discussed, the trial judge held that the Woods cancelled the "General Listing Agreement" before Nily Realty produced a ready, willing and able pruchaser, and that under Maryland law, a real estate brokerage listing such as the one here involved may be cancelled without

liability at any time up until the broker produces such a purchaser. Nily Realty challenges the trial judge's decision on both factual and legal grounds.

The appellant argues that the trial judge's finding of fact, that the Woods rescinded the listing agreement on April 9, 1973, was "clearly erroneous." Instead, the argument continues, the rescission occurred after Nily Realty produced a ready, willing and able buyer on April 13, 1973.

Alternatively, Nily Realty contends that even if the "General Listing Agreement" was revoked on April 9, 1973, the Woods had no legal right to revoke it at that time. Nily Realty insists that the "agreement" was initially supported by consideration because it should be "implied" that Nily promised to show the farm to its clients and to use its best efforts to sell the farm. Nily goes on to argue that even if the "agreement" was not initially supported by consideration, Nily's expenditure of time and effort, beginning April 5, 1973, when it first showed the farm, supplied the necessary consideration. Since, under Nily's theory, the "General Listing Agreement" was supported by consideration, the Woods had no right to revoke the "agreement" until the expiration of the twelve month term.

Maryland Rule 886 requires rejection of appellant's factual argument. The trial judge found that the Woods cancelled the "General Listing Agreement" and revoked Nily Realty's authority on April 9, 1973, prior to the time that Nily Realty produced a ready, willing and able purchaser. The testimony of both Robert Wood and Sally Wood was that Mrs. Nily was informed on April 9 that the Woods had decided not to sell the farm and that Mrs. Nily should "take it off the market." Mrs. Nily did not produce a purchaser ready and willing to buy upon the terms listed until at least April 13, 1973, if then. According to the testimony, on April 13 Mr. Fischer intended at first to make a counter-offer of $190,000.00 for the farm. It was only after three hours of negotiation with Mrs. Nily that he signed a proposed contract offering $215,000.00, with most of the money to be paid the following year. All of this evidence supports the trial judge's finding that the broker's authority was revoked

prior to the time the broker produced a purchaser ready and willing to buy upon the terms listed. The finding certainly cannot be deemed "clearly erroneous" within the meaning of Rule 886.

Real estate brokerage listings unsupported by specified valuable consideration moving from the broker or agent to the employer, have generally been considered unilateral agreements which, in the absence of fraud or bad faith, are revocable by the employer, without his incurring liability, until some degree of performance by the broker. 12 Am.Jur.2d, *Brokers* § 32 at 796. In some jurisdictions it is held that a principal's authorization for a broker to offer property for sale becomes a bilateral agreement supported by consideration upon the broker's expenditure of time or money. Under this view, as soon as the broker expends any time or money toward finding a purchaser, even though he may not actually produce one, the contract becomes enforceable and the principal may not without liability revoke the broker's authority. *See, e.g., Harris v. McPherson,* 97 Conn. 164, 115 A. 723, 724 (1922); *Braniff v. Baier,* 101 Kan. 117, 165 P. 816, 817 (1917); *Chamberlain v. Grisham,* 360 Mo. 655, 230 S.W.2d 721, 723-724 (1950); 12 Am.Jur.2d, *Brokers* § 32 at 796-797.

In other jurisdictions, however, including Maryland, it has consistently been held that the broker must do more before the principal loses his right, without incurring liability, to revoke the real estate broker's authority. Under the view taken by this Court, a property owner acting in good faith may without liability terminate a listing with a real estate broker at least up until the time when the broker has produced a buyer ready, willing and able to purchase upon the owner's terms. A real estate broker is employed not to expend time and effort but to accomplish a particular result, and until the accomplishment of that result his authority may be revoked. This has been the uniform course of decisions in this Court, from the very earliest to the most recent dealing with the revocation of a real estate broker's authority.

In *Beale v. Creswell,* 3 Md. 196 (1853), the defendant was

one of several persons holding title to property. One of the other title-holders, with the defendant's consent, employed the plaintiff broker "to procure a purchaser." The broker found a Mr. Morris who expressed a willingness to buy the property. Subsequent to this, the defendant purchased the interests of the other title-holders and then terminated the broker's authority. Thereafter the defendant sold the property to Mr. Morris. The broker, while disclaiming reliance upon actual fraud, claimed that he was nevertheless entitled to his commission. In holding that the broker's authority could be revoked up to the time the actual sale took place, the Court stated (3 Md. at 201):

> "In the case now before us the authority of the agent was revoked before the sale was effected and after the legal title had passed to the appellee. This circumstance would defeat the claim of the broker unless there was fraud in the appellee in the purchase of the property with the view of immediately selling it to the party mentioned by the broker, and thus availing herself of the information derived from him with the design of avoiding paying for his services."

About thirty years later, the Court said that the broker's authority could be revoked until the sale was "virtually effected." Thus in *Attrill v. Patterson*, 58 Md. 226, 250 (1882), the Court first stated:

> "It may be laid down, as a general rule, that an agent's authority to act for a principal, is always revocable at the will of the principal; and may at any time be put an end to by withdrawing the authority; unless the authority be coupled with an interest; or has been conferred on the agent for a valuable compensation moving from him to the principal."

And then (58 Md. at 251):

> "The rule is, that the broker is not entitled to his commissions till the work is *complete*; but, if after

the sale is virtually effected, the principal takes the matter into his own hands, and revokes the agency, he cannot escape the payment of commissions. In such cases, and there are many of them in the books, the broker is regarded as having earned his commission or compensation, by being the procuring cause of the transaction being consummated."

Probably the most often quoted statement of the rule concerning termination of a real estate broker's authority is in *Howard v. Street*, 125 Md. 289, 300-301, 93 A. 923 (1915), where the Court said:

"If then the principal has the right to revoke the agency, the correct interpretation of the above cited cases establishes no more than that where facts show a sale made by the principal to have been the result of the agent's efforts, the agent cannot be deprived of the commissions agreed upon if it is established that the purpose of the principal was to avoid the payment of the commissions by withdrawing the authority before the sale was actually consummated. In other words, in such an agency as here, *the principal had the absolute right to withdraw the authority before the sale was made,* and if afterwards he availed himself of the efforts of the agent and made the sale to the agent's customer he is not liable to the agent for commissions unless his withdrawal was made in bad faith towards the agent." (Emphasis supplied.)

These principles were reiterated very recently in *Partello v. Hagan Realty,* 246 Md. 14, 226 A. 2d 896 (1967). In that case the owner of a subdivision in the spring of 1963 gave the plaintiff broker an "exclusive listing" to sell houses in the subdivision. In August 1963, the owner terminated the arrangement. The following month, the owner signed a contract to sell a house in the subdivision to someone with whom the broker had been negotiating before the broker's authority was revoked. In reversing a judgment in favor of

the broker because the correct rule concerning revocation of the broker's authority had not been given to the jury, Judge McWilliams said for the Court (246 Md. at 18), quoting from the earlier case of *Hill v. Iglehart,* 145 Md. 537, 125 A. 843 (1924):

> " 'The general rule is that the principal may at any time, before the broker finds a purchaser ready, able and willing to buy the property upon terms satisfactory to the principal, revoke the agency . . . and that where such revocation is untainted by fraud or bad faith, the broker will not be entitled to commissions even though the principal after the revocation sells the property to a purchaser with whom the broker had been negotiating, and notwithstanding that the broker's efforts may have been the direct and procuring cause of such sale. *Howard v. Street,* 125 Md. 302; *Attrill v. Patterson,* 58 Md. 226; *Beale v. Creswell,* 3 Md. 201.' *Id.* at 550-51."

*See also Leimbach v. Nicholson,* 219 Md. 440, 447-448, 149 A. 2d 411 (1959); *Steele v. Seth,* 211 Md. 323, 330-331, 127 A. 2d 388 (1956); *Ebling v. Brewer,* 154 Md. 290, 298, 141 A. 363 (1928); *Hollyday v. Southern Agency,* 100 Md. 294, 296, 59 A. 646 (1905); *Livezy v. Miller,* 61 Md. 336, 343 (1884).

The appellant broker argues that the principles set forth in the above cases should be limited to listings with no fixed term and should not be applied to listings such as the one here, which was for a twelve month period. Nily Realty maintains that, with respect to listings for a fixed term, consideration should be implied from the outset or should be deemed present after a broker expends any time or effort to find a purchaser. Nily Realty relies upon the fact that a few of the above discussed cases involved listings with no terms stated, and the opinions referred to the listings as creating employments "at will." However, in the majority of the Maryland cases dealing with the matter of terminating a real estate broker's authority, the opinions do not indicate whether the authorizations to sell property were for stated

periods of time or not, and there is no indication from this Court's opinions that this factor has any pertinence. In fact, Nily Realty has called no Maryland cases to our attention, and we are aware of none, holding that a distinction should be made between a unilateral real estate brokerage agreement for a stated period of time on the one hand and a unilateral brokerage agreement at will on the other.

Nily Realty also argues that, with respect to agency "agreements" for a term with no consideration expressly stated, consideration should be "implied" under the theory announced by Cardozo, J., in *Wood v. Lucy, Lady Duff-Gordon,* 222 N. Y. 88, 118 N. E. 214 (1917). Nily argues that under the principle of the *Wood* case, an agency is not revocable during the stated term. If the instant case involved an *exclusive* agency for a term, the appellant's argument might have merit. However, the principle applied in the cited case has no application to a non-exclusive agency such as involved in this case.

The plaintiff in *Wood v. Lucy, Lady Duff-Gordon, supra,* was given the exclusive right for one year to use the defendant's personal endorsements on designs of dress manufacturers in return for 50% of the profits to be derived therefrom. When the defendant made personal endorsements independent of the exclusive "agreement" with the plaintiff the latter initiated suit for breach of contract. The defense to the suit was that no contract existed since the plaintiff did not "bind himself to anything." Dismissing this contention the court stated (118 N. E. at 214):

> "The agreement of employment is signed by both parties. It has a wealth of recitals. The defendant insists, however, that it lacks the elements of a contract. She says that the plaintiff does not bind himself to anything. It is true that he does not promise in so many words that he will use reasonable efforts to place the defendant's indorsements and market her designs. We think, however, that such a promise is fairly to be implied. The law has outgrown its primitive stage of

formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed . . . ."

The court then went on to discuss what in the agreement gave rise to an "implication of a promise" on the part of the plaintiff (*ibid.* emphasis supplied):

"The defendant gave an *exclusive privilege.* She was to have no right for at least a year to place her own indorsements or market her own designs except through the agency of the plaintiff. *The acceptance of the exclusive agency was an assumption of its duties.*

\* \* \*

"The implication is that the plaintiff's business organization will be used for the purpose for which it is adapted. But the terms of the defendant's compensation are even more significant. Her sole compensation for the grant of an *exclusive agency* is to be one-half of all the profits resulting from the plaintiff's efforts. Unless he gave his efforts, she could never get anything."

Not only did the court in *Wood* regularly refer to the fact that an "exclusive" agency was involved, but the court's reasoning applies only to an exclusive agency. In an exclusive agency, a principal is giving up a valuable privilege which he does not give up when he reserves the right to name any number of other agents to perform the same function. Moreover, in an exclusive agency, the principal's "sole compensation" is dependent upon the performance of the agent. In a non-exclusive agency, his compensation is not dependent upon the performance of any one particular agent; the principal has a multitude of avenues for the accomplishment of his object.

The principle set forth in *Wood v. Lucy, Lady Duff-Gordon, supra,* has normally been applied only to exclusive agencies. Just three years after the *Wood* opinion,

the same court viewed the grant of an exclusive sales agency as sufficient cause to imply a promise by the agents to use all reasonable efforts to sell the principal's products, stating (*Paige v. Faure*, 229 N. Y. 114, 127 N. E. 898, 899 (1920), emphasis supplied):

> "The owner of a product would not give another *the exclusive agency,* covering a wide territory, to sell the same unless he believed an effort would be made by the one to whom such right was given to sell; and one would not take, if acting in good faith, an *exclusive agency* to sell another's goods unless he expected and intended to use reasonable efforts to sell. Wood v. Duff-Gordon (sic), 222 N.Y. 88, 118 N.E. 214."

On the other hand, where an agency has not been exclusive, courts have declined to imply consideration where none has been expressly set forth in the "agreement." For example, in *Zeyher v. S.S. & S. Manufacturing Co.*, 319 F. 2d 606 (7th Cir. 1963), the plaintiff entered into a three year employment agreement whereby he served in the capacity of a sales engineer. He brought suit against the employer corporation for breach of contract upon being informed that a successor firm would not honor his employment agreement. In discussing the question of mutuality, and in holding that the "contract" was not enforceable, the Court of Appeals stated (319 F. 2d at 608, emphasis supplied):

> "In Wood v. Lucy, Lady Duff-Gordon . . ., the court implied consideration where defendant gave an exclusive agency, and unless the agent 'gave his efforts, she could never get anything.' That is not true of [the employer] . . . because *plaintiff did not have an exclusive agency. We do not find in the case at bar the facts which in Lady Duff-Gordon impelled the court to conclude that the transaction there 'was instinct with obligation.'* "

For other cases, including those in this state, indicating that the principle of *Wood v. Lucy, Lady Duff-Gordon, supra,* is

ordinarily applicable only to exclusive agencies, *see, e.g., Eastern Woodworks v. Vance,* 206 Md. 419, 112 A. 2d 231 (1955); *Foster-Porter Enterprises v. DeMare,* 198 Md. 20, 34-35, 81 A. 2d 325 (1951); *HML Corporation v. General Foods Corporation,* 365 F. 2d 77, 80 (3d Cir. 1966); *Mechanical Ice Tray Corp. v. General Motors Corp.,* 144 F. 2d 720, 724-725 (2d Cir. 1944); *Big Cola Corporation v. World Bottling Co.,* 134 F. 2d 718, 721 (6th Cir. 1943); *Galbreath-Ruffin Corp. v. 40th and 3rd Corp.,* 19 N.Y.2d 354, 280 N.Y.S.2d 126, 227 N.E.2d 30, 36 (1967); *Maxwell v. Schaefer,* 381 Pa. 13, 112 A. 2d 69, 71 (1955).

*Piper v. Wells,* 175 Md. 326, 2 A. 2d 28 (1938), a real estate brokerage case relied upon by the appellants, is entirely consistent with the view that where no consideration is specified in an agency agreement, it will normally be implied only if the agency is an exclusive one. It is not clear from the opinion in the *Piper* case whether the Court found the brokerage agreement to be supported by actual consideration or whether the Court was implying consideration under the theory of the *Wood* case. Regardless, the listing was an *exclusive* one for a term, as the owner agreed that if he or any other broker should sell the property during the term "then said owner shall pay [plaintiff] Realtor a commission on the amount for which said property is sold . . . ." 175 Md. at 329.[2]

Nily Realty did not have the exclusive right to sell the Woods' farm, and the Woods authorized eight other brokers to do the same thing during the same period. Without

---

2. The two other real estate brokerage cases upon which Nily Realty chiefly relies are McKeever v. Washington Heights Realty Corp.. 183 Md. 216, 37 A. 2d 305 (1944), and Singer Construction Co. v. Goldsborough, 147 Md. 628, 128 A. 754 (1925). The decisions in these cases do not support Nily Realty's position. McKeever v. Washington Heights Realty, *supra,* involved an exclusive agency coupled with an interest in the property. Singer Construction Co. v. Goldsborough, *supra,* did not involve an attempted revocation of the broker's authority prior to the expiration of the term. Instead, the property owner gave the broker an exclusive right for a twenty-four hour period to "present" a purchaser; the broker did present the purchaser within the period; the property owner then agreed to sell it to the person presented by the broker; and at the time fixed for "closing the deal," after the expiration of the twenty-four hour period, the property owner refused to sign the sales contract because he had just given an option on the property to someone else.

valuable consideration being set forth in a "listing" of this type, it would be wholly unreasonable to "imply" that the listing was initially supported by consideration and thus could not be revoked or to hold that the expenditure of time or effort by any particular broker made the listing with him irrevocable. The result of such a holding might be that the principal would be liable to several agents, all of whom were knowingly competing with each other to accomplish the same thing.

In the instant case the Woods authorized Nily Realty to perform a particular act, namely to sell their farm, and as the authorization was unsupported by valuable consideration, it could be revoked up until the time when Nily Realty fully performed. When the Woods terminated Nily Realty's authorization on April 9, 1973, the broker had not accomplished the object for which it was employed. Consequently, the broker's authority could be revoked without liability.

*Judgment affirmed.*
*Appellant to pay costs.*