YASUNA *v.* NATIONAL CAPITAL CORPORATION
OF WASHINGTON

[No. 103, September Term, 1974.]

*Decided February 4, 1975.*

618

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Bruce C. Bereano* and *William S. James* for appellant.

*D. Warren Donohue*, with whom were *Edith M. Gelfand* and *Trimm, Donohue, McDanald, Willis & McGuckian* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

This appeal is from a judgment in the sum of $80,000 in favor of appellee, National Capital Corporation of Washington (National), awarded in a non-jury action against appellant, Muriel M. Yasuna, for breach of contract. The judgment was rendered in the Circuit Court for Calvert County (Bowen J.), where the case had arrived after traveling a somewhat circuitous journey that included brief visits to Montgomery and Allegany Counties.

The contract found by Judge Bowen to have been breached provided for the payment of a broker's commission to National in the event it obtained construction and permanent financing for a condominium office building that appellant proposed to construct in Bethesda. Under the agreement, appellant "formally authorize[d] and employe[d] " National to obtain a "commitment" for the loans on the following terms:

| Construction: | $3,600,000 to $4,000,000 |
| | $8^{1}/_{2}\%$ — 9% interest rate |
| | 24 months, 1 point to lender |
| Permanent: | 75% of lower of selling price or appraisal value |
| | $8^{1}/_{2}\%$ — $8^{3}/_{4}\%$ interest rate |
| | 25 years, 2 points to lender (1 by borrower and 1 by purchaser) |

The contract, which was signed by appellant on February 26, 1973, employed National for a period of 45 days beginning on

that date; and required it to use its "best efforts to secure the loan commitment as authorized." Its compensation was fixed in the following language:

> "In consideration of their services in negotiating such loan, Borrower agrees to pay to Broker one % of the amount of each loan commitment, payable as follows: In full from first advance of construction loan, but fee will be earned *upon delivery of a commitment* within the above parameters, and acceptable to borrower's counsel as to form. *When commitment is delivered* under the foregoing terms or such other terms as may be acceptable to Borrower, Broker shall be deemed to have earned his entire fee. If both loans are placed with one lender and at the same time, broker's fee is one % of larger loan only. . . ." (emphasis added).

Subsequent to the execution of the contract, National initiated a substantial number of inquiries in an effort to obtain both the construction and permanent financing. On April 12, Nelson Greller (Greller), an employee of National assigned to negotiate these loans, received a letter from Government Services Savings & Loan, Inc. (GSSL), informing Greller that it had approved appellant's requested commitment for a permanent loan in the sum of $4,000,000. Some changes in that letter resulted in a replacement dated April 17, which was signed as accepted by appellant on April 30. She also handed to Greller at that time, for delivery to GSSL, her check in the sum of $20,000, representing a "partial non-refundable commitment deposit" as required by the commitment. The balance of the deposit was to be in the form of "an irrevocable letter of credit, or hypothecated savings account, in the amount of [$60,000]."

Prior to final acceptance of the permanent-loan commitment, National had commenced a search for the construction financing. Greller reported on his progress at a conference held in the office of appellant's Washington counsel on May 14. When asked for a prognosis, he responded: "We told her that we would be able to get the

loan, but we could not set a date on it. We told her it was not a question of 'if' but 'when.'" He was then instructed to continue with his efforts.

Following an aborted application submitted to a lending institution in Atlanta, Georgia, appellant authorized an application to be made with Atico Advisory Corporation of Miami, Florida (Atico) in the month of June. On June 15, appellee turned over to Greller her check in the sum of $19,000 for delivery to Atico with the application. The application letter prepared on that date provided that the deposit was to be refunded if a commitment was "not issued orally by June 22, 1973, followed immediately by written commitment, or if commitment is issued on different terms than applied for and is not acceptable to applicant." The application letter requested a 30-month loan at "$4^1/2$% over floating prime plus one point."

On June 21, 1973, at about 5:00 p.m., Greller was advised by telephone that Atico "had granted the commitment" subject to certain terms and conditions which were then enumerated. He was also advised that if there were any additional conditions, he would be called on the following day. According to Greller, he called appellant's Washington counsel and relayed the conditions to him, and was told "that it was a very fair commitment and he was delighted." The attorney testified that he could recall neither the conversation nor whether he expressed an opinion. Later that evening, at 8:00 p.m., Greller reached appellant and related to her the conditions and what he alleged to be the reaction of her attorney. He testified that she wanted to "hear the further conditions" as soon as he obtained them from Atico on the following day.

One condition imposed by Atico during the June 21 telephone conversation, with which appellant expressed dissatisfaction, was the so-called "50% pre-sales" requirement. This meant that after receiving her initial "draw" upon the construction loan at the closing, she would not be permitted any further "draws" until 50% of the condominium units had been sold. This condition had been the subject of prior discussions. On May 8, she had signed a

letter addressed to National in which she acknowledged her awareness of, and unqualifiedly accepted, the condition "that after the closing draw has been made, there will be no further draws until fifty percent of the net saleable space is under contract . . . ." Greller testified that, in view of her unhappiness with this condition, he asked whether he should call Atico and forego the commitment, but that she said "no," and wanted to hear "the further conditions" on the following day.

The testimony by appellant, however, was that she also voiced objection to other conditions conveyed during the June 21 telephone conversation. One was a 24-month term limitation with a proviso that it could be extended for an additional six months upon the payment of one-half percent of the balance then due. The second condition was a fee of $31,250 for "progress inspection and disbursing" ; and the third was a charge of $6,250 for legal fees.

On the following day, June 22, Greller was advised by Atico that there were no further conditions. He then called appellant to report this to her, and when "she said she was unhappy about the presales, . . . I asked her again if I should give up the commitment . . . and she said, 'No, do not call Atico.' " He then testified that she "wanted to see all the details and she said, if it is a commitment that she can live with, she can see her way clear, she will accept it." Appellant did not recall the June 22 conversation, but denied authorizing Greller to continue in response to a question as to whether he should reject the Atico commitment.

At 12:55 p.m. on June 22, appellant delivered a "stop payment" request to her bank on the $19,000 deposit check. She claims she informed Greller of her intention to do so during the June 21 conversation, but he maintains that he did not learn of this until the 26th when he received a request for an explanation from Atico. On that date, he reached appellant who stated that she had taken the action so that she could be " 'free to work around, I couldn't be tied up.' " He reported that he expected a letter of intent from Atico on the next day — June 27 — and asked her "if she wanted to consider it," and she said " 'yes' bring it to her."

On June 27, Greller received a letter from Atico, dated June 25, which advised him of its approval of the loan, and stated that a "formal commitment including all of the conditions and requirements of Atico will be forthcoming in a short time." He immediately prepared a letter to appellant and delivered it and the Atico letter to her personally at 11:00 a.m. He stated that "she read the letter over briefly and said that she would get back to me that afternoon or that evening." Although his covering letter mentioned the $31,250 progress inspection fee, he informed her verbally that as the result of telephone negotiations, Atico had agreed to reduce that sum to $16,400. Although she did not recall the June 27 confrontation, appellant acknowledges receipt of the latter information. Following a June 28 telephone call to appellant, in which she declined to accept the loan and also announced her refusal to pay a commission to National, Greller received a letter from her attorney, dated June 27, "terminating her relationship" with National.

The trial judge, sitting as the trier of fact, announced a carefully considered decision from the bench immediately upon the conclusion of the trial. In so doing, he left no doubt that he accepted Greller's version of the facts over the testimony given by appellant. In large measure, he was influenced by what he termed the "crisp and precise" testimony of Greller, who had maintained copious notes throughout the entire transaction, as opposed to appellant's testimony, which he characterized as partially "reconstructed."

Thus, Judge Bowen found that National had rendered substantial performance under the contract, and that it would have performed in accordance with the precise terms of the contract had not appellant's actions intervened. The court reasoned that there had been substantial performance, since the interest rate conformed to the limits specified in the application, and the 24-month limitation was not material. Furthermore, the court found that anyone as experienced in real estate matters as appellant was should have anticipated that the settlement expenses and fees would have been of the magnitude charged by the lender.

The court also found that the proposed inspection fee of $31,250 would not have justified the action taken by appellee because it was clear that this amount would have been reduced by negotiations. Indeed, it is abundantly clear from his opinion that he did not believe the inspection fee was appellant's actual reason for refusing to perform. Thus the court concluded that appellant had been "unreasonable, arbitrary and capricious" in "abandon[ing]" the contract; and that when she terminated appellee's employment, the latter had "substantially complied" with its undertaking under the contract.

In urging reversal, appellant contends that since the employment contract between the parties was unilateral, it could be terminated at will by the employer prior to performance by the broker, absent fraud or bad faith. She maintains that she terminated National's employment before it had rendered performance under the contract, since the commission was to be earned only "upon delivery of a commitment," and that none had been produced when she declared the contract at an end. Nor did the court below find that appellant had been actuated by fraud or bad faith. She claims further that, as a matter of law, National had not achieved substantial performance prior to termination of the contract; nor had her actions prevented National from accomplishing total performance.

A second issue presented by this appeal was not reached by the trial court, *i.e.*, whether National is nevertheless entitled to a commission for producing the permanent loan even if it did not obtain construction financing. Appellant maintains that National was not entitled to any commission unless it produced *both* permanent and construction financing. Since we agree with the result reached by the trial court, we need not decide that question either.

There appears to be no dispute over the proposition that the agreement between the parties was one which is generally considered to be unilateral. Although virtually all the reported decisions considering this category in the owner-broker context have dealt with the employment of a broker to find a purchaser of real estate, the same principles

are nevertheless applicable here. In such circumstances, the employment of the broker to procure the purchaser, for which the owner promises to pay a specified commission, is an offer by the latter. The broker's actual rendition of the requested service is the acceptance. 1 Corbin, *Contracts* § 50 at 199 (1963). Similarly, what arose here was a unilateral contract — a promise to pay a commission for a service to be rendered.

It is upon the classification of the contract here as unilateral that appellant postulates her argument. In a consistent line of cases beginning as early as *Beale v. Creswell,* 3 Md. 196 (1852), we have adhered to the principle that an owner, in the absence of fraud or bad faith, may terminate a listing with a real estate broker without liability, prior to performance by the broker, *Knopf v. Merc.-Safe Dep. & Tr.,* 252 Md. 293, 303, 250 A. 2d 96 (1969); *Partello v. Hagan Realty,* 246 Md. 14, 18, 226 A. 2d 896 (1967); *Hill v. Iglehart,* 145 Md. 537, 550-51, 125 A. 843 (1924); *see also Leimbach v. Nicholson,* 219 Md. 440, 447-48, 149 A. 2d 411 (1959); *Steele v. Seth,* 211 Md. 323, 330-31, 127 A. 2d 388 (1956); *Ebling v. Brewer,* 154 Md. 290, 298, 141 A. 363 (1928); *Livezy v. Miller,* 61 Md. 336, 343 (1884). Just recently, in *Nily Realty v. Wood,* 272 Md. 589, 325 A. 2d 730 (1974), Judge Eldridge, for the Court, reiterated the rule of our prior cases:

> "The general rule is that the principal may at any time, before the broker finds a purchaser ready, able and willing to buy the property upon terms satisfactory to the principal, revoke the agency ... and that where such revocation is untainted by fraud or bad faith, the broker will not be entitled to commissions even though the principal after the revocation sells the property to a purchaser with whom the broker had been negotiating, and notwithstanding that the broker's efforts may have been the direct and procuring cause of such sale. . . ." 272 Md. at 601.

What distinguishes this case factually from those cited

above, as we have suggested, is that here the broker was employed to obtain financing rather than a purchaser. In this type of contract, we have not had occasion to consider what degree of performance by the broker is required before he can successfully insulate himself from the owner's power to revoke; and unquestionably, the determinative issue presented by this case is whether the purported revocation was timely. If it was, the outcome is controlled by the principle quoted above, and appellant must prevail.

The initial question to be decided is when the revocation did occur. Arguably, the stop-payment order on June 22, particularly had it been communicated to National at the same time, might have sufficed for this purpose. Appellant concedes, however, as well she must, that it was not a termination, and suggests that this probably occurred on the 27th. Although the trial judge made no finding in this regard, we think the evidence permits but one conclusion — that the date on which appellant sought to revoke the agency was June 28. This was the day when, for the first time, she categorically declined to accept the loan, and was the day on which Greller received the letter from her attorney expressly terminating the employment. Despite her seemingly inconsistent actions at times, on no prior occasion did she ever inform National that their relationship was at an end.

Thus, we reach the question of what was necessary to establish such performance by the broker as would preclude revocation; and whether that was rendered here prior to the attempted revocation on the 28th.

Addressing the more common real estate sales situation in *Nily*, we made it clear that where the contract is unilateral, the property owner may terminate a listing at any time prior to the production of "a buyer ready, willing and able to purchase upon the owner's terms." In that particular case, of course, we observed that the broker's right to recovery was predicated on Maryland Code (1957, 1973 Repl. Vol.) Art. 21, § 14-105, rather than upon a "special agreement to the contrary." Here, there is such an agreement, which is therefore controlling, and the statute does not apply.

The key provisions in the contract are ". . . fee will be earned upon delivery of a commitment" and "When commitment is delivered." Manifestly, the decisive question is what constitutes the delivery of a commitment within the contemplation of the contract. The essence of the trial judge's decision was that substantial performance of the obligation to deliver a commitment was sufficient under the contract; and that this was rendered by National, which was prevented from achieving total performance only by the actions of appellant. These findings are attacked by appellant who argues strenuously that the performance was not substantial.

We are mindful, as we said in *Nily*, that " [a] real estate broker is employed not to expend time and effort but to accomplish a particular result, and until the accomplishment of that result his authority may be revoked." 272 Md. at 598. We think that here the broker not only expended "time and effort," but accomplished the necessary result.

As we see it, the stance adopted by appellant amounts to a tacit concession that National produced a commitment. She claims, however, that there was no substantial performance under the contract because certain terms of the commitment were at variance with those she had requested. In our view, it is unnecessary to decide whether, as she contends, National failed, as a matter of law, to prove substantial performance, since we think full performance under the contract had been rendered prior to the attempted revocation.

The four items placed in contention by appellant are: the pre-sales requirement; the $31,250 progress fee; the 24-month limitation coupled with the one-half percent charge for a six-month extension; and the legal fees of $6,250. As early as May 8, appellant had signified her approval of the pre-sales requirement, and despite her knowledge that it was to be a condition, never sought to terminate the employment prior to June 28. The employment contract, itself, contemplated a 24-month loan, and appellant fully recognized at all times that the 30-month

stipulation in the application was nothing more than a request.

Although the progress fee of $31,250 was not an inconsequential item, immediately before the attempted termination it was reduced to $16,400. This sum, coupled with the legal fee, was not sufficient, considering the magnitude of these loans, to refute National's claim of contract performance. As Judge Bowen said, referring to appellant, ". . . she is a real estate broker herself and so she ought to be presumed to know something about the world of real estate, mortgages and points, commitment fees, commitments and other such impedimenta of the real estate and financial world." This observation was doubtlessly inspired by inferences, drawn from the testimony, that such items as progress fees and legal costs would hardly be inserted in a loan application by the borrower; but that, on the other hand, the inclusion of such charges in the commitment was predictable, since they are rather commonplace in financing transactions of these dimensions.

In sum, by the time that appellant attempted to revoke the employment on June 28, National had performed in accordance with the employment contract. It had accomplished the result for which it had been employed by delivering a commitment. Nothing more remained for National to perform, and arrival of the so-called "formal" commitment had been stymied only by the stop-payment order, as Atico stressed in the June 26 telephone conversation with Greller. Hence, the purported revocation on June 28 came too late to be effective, and appellant was liable for the commissions in accordance with the contract.

*Judgment affirmed; appellant to pay costs.*