## MacWILLIAMS et al. v. BRIGHT t/a Bright Acres Realty

[No. 84, September Term, 1974.]

*Decided February 6, 1975.*

The cause was argued before Murphy, C. J., and Singley, Smith, Digges, Levine, Eldridge and O'Donnell, JJ.

*Alan W. Bernstein,* with whom were *Lawrence B. Goldstein* and *Goldstein, Solomon & Bernstein* on the brief, for appellants.

No brief filed on behalf of appellee.

ELDRIDGE, J., delivered the opinion of the Court.

The appellee, a real estate broker, brought this action to recover a commission allegedly due because of the sale of appellants' home.

The appellants, William K. MacWilliams and Bertha N. MacWilliams, owned a house located on a 4.89 acre parcel of land in Owings, Maryland.[1] In 1969, Mr. MacWilliams first approached Mrs. Jeanne Geoffrey, a real estate saleswoman then employed by Freland Realty, with the request that she find a purchaser for the house and lot. They agreed orally that she was to attempt to find a purchaser for the house at a price of $75,000. It was further agreed that she would be entitled to a 6% commission if successful. From time to time MacWilliams would inquire about her prospects of selling his house and renew his request that she do so. While employed by Freland Realty, she showed the house to prospective buyers.

In 1971, Mrs. Geoffrey changed employers and became a saleswoman for the appellee, Eldon Bright, who owned and operated Bright Acres Realty. She took her listings with her to the Bright agency, including the listing on the MacWilliams home. During the period of her employment with the Bright agency, she also showed the MacWilliams home to prospective buyers who decided that they were not interested.

On April 7, 1972, Mrs. Geoffrey took Robert and Anna Moore, the eventual buyers, to see the MacWilliams home. Although Mrs. Geoffrey had previously arranged with Mr. MacWilliams to bring the Moores by on the afternoon of April 7, there was no one at home to let them into the house. After waiting about an hour and a half at a neighboring house, Mrs. Geoffrey took the Moores to a nearby restaurant so that they could get dinner and possibly encounter MacWilliams. While the Moores were in the restaurant

---

1. The record indicates that the MacWilliamses were having domestic difficulties at the time of the events which led to this appeal. Mrs. MacWilliams took no part in the negotiations involved in this case, except that she made clear that she would agree to any sales contract which Mr. MacWilliams signed.

MacWilliams entered, introduced himself, and invited them to see his house. As the Moores were leaving the house, MacWilliams told Moore that the price of the house was $75,000.

On April 12, 1972, in the office of Bright Acres Realty, the Moores signed a contract prepared by Eldon Bright to purchase the house for $62,500 with a 6% commission being paid to Bright Acres Realty. The Moores gave Bright a $1,000 check as a deposit.

In the evening of April 12, Bright took the contract to MacWilliams's home and presented it to him. MacWilliams rejected the offer of $62,500 for the house and made a counteroffer of $75,000. The contract was changed accordingly and initialled by MacWilliams. There is some conflict in the testimony with regard to what happened that evening. Bright testified that MacWilliams indicated some willingness to bargain if the Moores' offer would approach his counteroffer. MacWilliams testified that he told Bright that if the $75,000 counteroffer were not accepted, he did not want to be obligated in any way to Bright Acres Realty.

Shortly thereafter, Mrs. Geoffrey attempted to persuade the Moores to accept and sign the counteroffer of $75,000. They declined to do so. Mr. Bright also contacted the Moores who told him that they were unsure what action they would next take.

About 10 days after his counteroffer, MacWilliams called the Moores and inquired whether they still wished to purchase his house. Following about two weeks of negotiation, a contract of sale between MacWilliams and the Moores was signed on May 6, 1972. The contract set a price of $70,000 for the house and did not provide for any commission to Bright Acres Realty or any other real estate agent.

On May 19, 1972, Bright sent a letter to MacWilliams, asserting that he was entitled to a commission if the house were sold by MacWilliams to the Moores. On the same date, Bright returned the check for the $1,000 deposit on the property to the Moores. Settlement on the sale of the

MacWilliams property to the Moores was held on September 7, 1972.

After MacWilliams's failure to pay the real estate commission demanded by Bright, the latter brought this suit against the MacWilliamses in the Circuit Court for Calvert County. The case was tried on March 11, 1974, and the court (Bowen, J.) granted a judgment for Bright in the amount of $4,200. The court rejected MacWilliams's argument that he had terminated Bright's employment by making a final counteroffer to the Moores through Bright which was not accepted. The trial court found that MacWilliams had not revoked Bright's employment on the evening of April 12, 1972. The court found that "[e]ssentially what ... [MacWilliams] did was say that that price isn't satisfactory, here is my asking price, put that in and see if you can get it."

On appeal to this Court, MacWilliams's principal argument is that Bright is not entitled to his commission because Bright's contractual relationship with MacWilliams had been terminated prior to the negotiations between MacWilliams and Moore which led to the sale. MacWilliams challenges the trial court's finding that he did not terminate Bright's authority on April 12, 1972. MacWilliams also argues that Bright's alleged failure to pursue his counteroffer constitutes an abandonment by Bright of the employment contract.

### (1)

The trial court correctly concluded that, absent a revocation of Bright's contractual authority to sell the house for MacWilliams, Bright is entitled to his commission in this case. As this Court said in *Leimbach v. Nicholson,* 219 Md. 440, 447, 149 A. 2d 411 (1959):

> " ... [A]n owner may not take advantage of a broker's services to secure a prospective purchaser and then deprive him of his commissions by selling directly to his client at a price less than the broker could sell under his authority, particularly where the authority is unrevoked. ... In such a case the inference may be drawn that the broker was in fact

the procuring cause, and that the owner's refusal to accept the offer submitted was a subterfuge to avoid payment of commissions which the broker had fairly earned."

If MacWilliams had revoked Bright's employment contract on April 12, 1972, the result would then be different. *See Yasuna v. National Capital Corp. of Washington,* 273 Md. 617, 331 A. 2d 49 (1975); *Nily Realty v. Wood,* 272 Md. 589, 325 A. 2d 730 (1974), and cases therein discussed, dealing with revocation of a broker's authority. However, the trial court, which had the opportunity to hear the witnesses, found that MacWilliams did not terminate Bright's employment at that time but instead made a counteroffer which was left open to negotiation. This finding is supported by Bright's testimony. Maryland Rule 886, specifying that the trial court's factual findings cannot be set aside unless "clearly erroneous" and that "due regard" must "be given to the opportunity of the lower court to judge the credibility of the witnesses," is applicable here. Therefore, we must accept the trial court's finding that MacWilliams had not revoked the broker's employment. Absent such a revocation, and since the broker had procured the purchaser who did enter into a signed contract with the owner for the sale of the property, the broker "is deemed to have earned" his commission. Maryland Code (1974), § 14-105 of the Real Property Article [2]; *Nily Realty v. Wood, supra,* 272 Md. at 594-595; *Wyand v. Patterson Agency,* 271 Md. 617, 319 A. 2d 308 (1974), and cases therein cited.

(2)

Alternatively, MacWilliams argues that Bright abandoned his employment contract by failing to make efforts to continue negotiations with the Moores.

We agree with MacWilliams that where a broker is authorized by a property owner to sell property, inaction by

---

2. Formerly Code (1957, 1973 Repl. Vol.), Art. 21, § 14-105.

the broker for a period of time may constitute an abandonment of the employment contract. *Crowe v. Trickey,* 204 U. S. 228, 239, 27 S. Ct. 275, 51 L. Ed. 454 (1907); *Sibbald v. Bethlehem Iron Co.,* 83 N. Y. 378, 383 (1881); 12 Am.Jur.2d *Brokers* § 223 (1964). No hard and fast rule can be set forth as to the length of the period of inaction which would warrant the employer to conclude that abandonment had taken place. Each case must be considered on its own facts. *Houston v. Siebert,* 129 N.J.L. 468, 30 A. 2d 35, 38 (1943); *E. A. Strout Realty Agency v. Wooster,* 118 Vt. 66, 99 A. 2d 689, 694 (1953); 12 Am.Jur.2d, *op. cit. supra,* § 223.

In this case, Mrs. Geoffrey, Bright's employee, had been authorized by oral agreement for 3 years to find a purchaser for MacWilliams's house. A mere 24-day period of limited activity by Bright Acres Realty following MacWilliams's counteroffer and before the contract between MacWilliams and the Moores was signed cannot be deemed to constitute abandonment. It would be unreasonable for MacWilliams, who began his direct negotiations with the Moores only 10 days after his counteroffer, to have treated this as an abandonment.

Consequently, the trial court correctly concluded that Eldon Bright t/a Bright Acres Realty, was entitled to a commission of $4,200 on the sale of the MacWilliams home to the Moores.

*Judgment affirmed.*
*Appellants to pay costs.*